**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **Derek Gardner,** | ) | |
| | ) | |
| **Petitioner**, | ) | |
| | ) | No. 09 C 577 |
| | ) | |
| | ) | |
| v. | ) | Ronald A. Guzmán |
| | ) | |
| **United States of America,** | ) | |
| | ) | |
| **Respondent.** | ) | |

# Memorandum Opinion and Order

This case comes on to be heard for the court to determine whether defense counsel's failure to file a suppression motion prejudiced the petitioner, Derek Gardner, in his trial and conviction for unlawful possession of a weapon by a convicted felon. The Court must determine the likelihood that a motion to suppress would have been granted, thus changing the outcome of the trial.

The motion to suppress that Gardner presented prior to trial alleged that he was never in possession of a weapon, but that while performing a search without probable cause, the officers planted the gun on his person.[1] Gardner's testimony at the prejudice hearing was quite different. He testified that he did in fact have the gun on his person and that the officers recovered the gun from him pursuant to the search. Gardner now

---

[1] For this reason, the motion to suppress which the Court is called upon to evaluate today is not the motion to suppress Gardner sought to present to the Court before his trial. Today, we evaluate a motion to suppress in which the Gardner testifies and openly admits he possessed the gun he previously declared had been planted on him by the police officers. Today, Gardner claims he would have been willing to admit possession of the weapon had his attorneys properly apprised him of the available legal strategies. But, such a strategy is not without legal risks which, prior to trial, might have loomed much larger than they do now that Gardner has nothing to lose.

admits that his written representations to the Court at the time were intentionally false and that the gun was not planted on him by the officers as previously represented. When cross-examined on this point, Gardner's explanation appears to be that at the time he filed the pro se motion to suppress, because he is not an attorney, he was unaware that he could tell the truth and admit possession of the gun while maintaining his innocence.

        The negative effect of this testimony on Gardner's credibility is hard to overstate. He has admitted he felt justified in lying to the Court when the truth would not get him what he wanted. Moreover, it was clear from his demeanor while giving this explanation that he felt justified in doing so. The Court is now asked to believe a petitioner who, in order to attain the very same relief he now seeks, was quite willing to invent an entire factual scenario - a scenario which involved falsely accusing two law enforcement officers of fabricating physical evidence in order to frame him for a crime he did not commit. Gardner's sworn testimony at the prejudice hearing does nothing to help his cause.

        Gardner testified that on October 14, 2002, he was out with some friends on the south side of Chicago fighting dogs in order to put some money together for a drug deal. Later that night, Gardner and his unnamed friends, all of whom could have given valuable testimony had they been called, came to the parking lot/entryway of the Cabrini Green housing project building located at 412 W. Chicago for the purpose of engaging in a drug transaction. Gardner had previously arranged to meet with his established drug supplier, a person by the name of Black. While standing outside the building, Gardner apparently yelled up to Black and was acknowledged. He proceeded to wrap his money in a brown paper bag and place it on the ground, as was his custom. Gardner then drank

his beer and "took a urination and when I looked back up everybody was gone and I looked around and I seen the squad car coming into the parking lot." The police officers, who were responding to a 911 call of an assault in progress at 412 W. Chicago, exited the police car and approached him. According to Gardner, the officers grabbed him, put him up against the car and conducted a pat-down search which resulted in the recovery of the gun from his pocket. Gardner denies telling the officers that he was coming from Apartment 407 (the scene of the reported assault) before he was frisked. This testimony makes little sense. What happened to the drug transaction? What happened to the petitioner's money that he wrapped in a paper bag and left on the floor? Why would he leave money on the floor outside the project building while he urinated? How was this drug transaction to be consummated? How could he have been so out of touch while he urinated that he did not notice everyone fleeing the area and the police arriving? This description of events is irrational, illogical and unbelievable.

In support of his latest version of what occurred that night, Gardner also called Mr. Arinza Martin, one of the two inhabitants of Apartment 407 from which the 911 call for help originated. Gardner argues that Martin's testimony contradicts what the police officers said in their reports and testimony. Specifically, Martin denies ever having identified Gardner as the person who was threatening to break into his home with a gun. The problem is that while Martin contradicted the police reports as Gardner contended, his testimony also made little sense. Martin testified that he heard Kesha Hill call the Chicago Police Department to report a man outside the door of his apartment threatening to come in. Later on, he also called the police department and told the dispatcher there was a man outside his door with a gun. But, he also testified that he never saw the person

threatening him from outside his door and he never told the police that the assailant was 5'7" tall, weighed 165 pounds and had short hair. Yet, the dispatcher reports are clear that it was Martin, in the second call to 911, who stated that the offender sometimes wore a diamond earring in his left ear and had a gun. Unless the dispatcher was mistaken or lying. Martin's testimony today is completely contradicted by a police dispatch issued some ten years ago at the time the events were actually occurring.

       In court, Martin denied ever having seen anyone outside his door that evening. He claimed he looked through the door's peephole, but saw nothing and denied ever telling the police that the man outside his door sometimes wore a diamond earring. He also denied that he saw Ms. Hill open the door to the apartment or even look through the peephole. He denied ever hearing Ms. Hill say that she knew who was outside the door of the apartment and the dispatcher's report also reflects that the assailant was unknown. Finally, Martin denied the assertion in the 911 dispatcher's report that Tamara (Kesha) Hill was his sister. Martin contradicted almost every piece of information contained in the two 911 dispatcher's reports that sent the police to 412 W. Chicago Avenue that night.

       In order to believe Martin's testimony, the Court would have to believe that there was no basis for the dispatcher's description of the assailant as he (Martin) never saw the assailant and Kesha Hill never looked through the peephole or opened the door and did not know the assailant. If this were true, Ms. Hill could not have described the assailant either. But, it is hardly likely that the dispatcher, for no reason at all, would make up a description of an assailant when directing officers in response to a 911 emergency call for help. Furthermore, the description of the offender as a person who sometimes wears a diamond earring in the left ear strongly implies that the person giving the description

knew the offender and had seen him on several prior occasions - enough to know that he frequently, but apparently not always, wore an earring in his left ear only. Yet, according to the dispatch, Ms. Hill told the dispatcher that their assailant was an unknown male and Martin now denies knowing who the assailant was or ever even having seen him. The record is devoid of any reason for a 911 dispatcher to have made up such information. The 911 calls are reports reflecting conversations with Martin and Ms. Hill that took place before Gardner was arrested and searched. There can be no conspiracy here between police officers and the dispatcher to lie about what Martin and Ms. Hill said that night. The 911 dispatcher was not involved in the events leading up to Gardner's arrest after the officers arrived. The dispatcher had no reason to lie or exaggerate the information that he passed on to the responding officers. Doubtless this was just one of many calls he or she received that evening and the dispatcher's only motivation would have been to be as accurate as possible in directing police officers to render assistance in an emergency call. What is clear is that Martin is simply not telling us much, and likely most, of what occurred that night at his apartment. Martin's testimony, which so blatantly contradicts the dispatcher's reports, is simply not credible.

      The transcript of the trial testimony of the arresting officers Michael White and Thomas Polick was admitted in evidence at the prejudice hearing and Gardner also called Officer Polick to testify. His testimony was essentially the same as he gave at the trial of the cause some 10 years ago. The officers give, not surprisingly, a completely different version of events from Gardner and Martin. In summary, the officers testified that they received a call from the 911 dispatcher to go to 412 W. Chicago Avenue, Apartment 407 in response to a complaint of an assault in progress. While en route, the call was updated

to "man with a gun." Upon arriving, they observed an individual at or near the entrance of the building walking away from the building down a ramp. As Officer White exited the car, Gardner walked towards him. Officer White asked him where he was coming from and Gardner said "407." Gardner then immediately put his hands on the front of the squad car and Officer White conducted a protective pat-down search during which he found a loaded pistol in Gardner's right jacket pocket.

Gardner argues that the testimony of Officers Polick and White is not credible. First, he contends that it is not plausible that he would walk up to the officers, place his hands on the car, and voluntarily take the position officers require when searching a suspect. Yet, both officers testified to this fact and their testimony was not effectively challenged by cross-examination either during the criminal trial or the prejudice hearing. Nevertheless, there was one major inconsistency in the testimony of the officers. As he testified at the trial and at the hearing, Officer Polick initially told the prosecuting attorneys that he first saw Gardner at a different place in the area around the building. However, Officer Polick explained the basis for his initial error and was confident, credible and consistent in his testimony supporting the testimony given by Officer White. It is not incredible to believe that a person possessing a weapon who had just committed an assault with a gun, upon realizing that the police are waiting for him and he could be in jeopardy of being shot by the responding officers, would voluntarily place himself in a non-threatening position. Such an action is even more likely from a person like Gardner who has been arrested prosecuted and convicted on numerous prior occasions.

Indeed, Gardner's testimony inadvertently gave some brief insight into his familiarity with such situations when he testified, on direct examination, that when the

officers asked him what he was doing there, he said "I'm doing nothing. I had my hands up." This all occurred before he had been detained in any manner. By his own testimony, as he said "I'm doing nothing" without any prompting, Gardner was putting his hands up to show the officers he was no threat. Though he now denies having voluntarily placed his hands on the hood of the police car, Gardner's own testimony is not far from what the officers described in this respect. He was clearly anticipating the need to assume a non-threatening posture with these police officers, whom he testified he believes he startled. Gardner also testified at the prejudice hearing that once Officer White announced the presence of a weapon, the other police officers became tense: "Some more officers was there and they basically got tense. Everybody went grabbing their weapon . . . ." Gardner was clearly attuned to the dynamics of such situations and the possibility for violence. That he would choose to eliminate any possibility that he could be accidentally shot while armed with a dangerous weapon by voluntarily putting his hand on the squad car or by holding his hands up is entirely believable.

    Gardner also makes much of the fact that the arrest report prepared by the officers does not say he responded to the officers by saying he was coming from 407 when they first spoke to him. However, a review of the arrest report (Exhibit 7) and the case report (Exhibit 8) shows that the entire events of that evening is summarized in a terse description of only six lines. This report clearly left out information and potentially important facts. For example, Gardner admits that the officers asked him where he got the gun and he told them he found it in some bushes (also a lie). Yet, this conversation is not contained in the arrest or case reports. Indeed, the first time any mention of this statement is found is in what appears to be a notation made on a felony review folder by

an assistant state's attorney who, in the ordinary course, would not even have been at the scene of the crime when the statement was made (Exhibit 11). So, it is clear that statements, even self-incriminating ones that are of great evidentiary value to a lawyer, are not necessarily included in arrest and case reports written by police officers. The fact that such a statement is not included in the police reports is not strong evidence that the statement was not actually made. On the contrary, the skimpy narrative contained in these police reports clearly left out important facts - some facts that are not even now in dispute, but that is hardly unusual. It does not mean that the officers' testimony was untrue.

Finally, if Gardner was testifying truthfully, then there are several witnesses who were not called who could have given valuable testimony. For instance, Gardner failed to call any of his friends who were with him that night. He, and only he, knows who those friends are or where they can be found, and they could easily have corroborated his convoluted version of events. Nor does he explain his failure to call them. It is entirely possible that after then years they would not be available, but in that regard we are left to speculate. Gardner also failed to call any other police officers to testify in spite of the fact that, according to him, another car of police officers pulled up before Officer White disarmed him. None of those police officers, who it appears might have been able to shed some light on what actually occurred during the search (for example, at what point, if any, guns were drawn), were called to testify. Officers White and Polick maintain the other backup police officers did not arrive until after Gardner had been disarmed and, thus, are not helpful witnesses in this case.

The Seventh Circuit noted in its opinion that Gardner's allegations that the police accosted him without provocation, coupled with the evidence of his physical dissimilarity to the armed assailant described by the dispatcher, could have resulted in a ruling that the pat-down search violated the Fourth Amendment. It goes on to indicate that Gardner's credibility will have to be ruled upon, in the first instance, by the trial Court. For the reasons given above, the Court finds both Gardner and Martin lacking in credibility. The Court, as did the jury before it, finds the officers' testimony substantially consistent and credible. From their testimony we know the officers were aware of the following before Officer White asked Gardner where he was coming from: (1) the dispatcher had received the call of an assault in progress just a few minutes before they arrived at the scene; (2) the assault was being conducted by a black man approximately 5'7" tall, weighing 165 pounds with short hair; (3) the assailant was in possession of a gun; and (4) upon the officers' arrival, Gardner was exiting the building in which the assault took place.

At this point, Officer White merely asked Gardner a question. Neither officer had his gun drawn nor did either officer make any move towards Gardner at the time the question was asked. Thus, prior to answering the question, Gardner had not been detained in any way. Only after he admitted coming from the apartment where the assault with a gun had taken place was Gardner's freedom of movement restrained. While true that the description of the offender did not match Gardner in height or weight, the officers' actions following the petitioner's admission that he had just come from the scene of the assault were clearly reasonable in view of all the facts known to them. *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968) (an officer may stop and investigate an individual if the officer has a reasonable, articulable suspicion that the individual may be engaged in

illegal activity and may conduct a pat-down search if the officer believes the individual may be armed and dangerous). In addition, the intrusion was minimal and tailored to meet the situation. Officer White merely conducted a pat-down search designed to uncover the weapon described in the dispatcher's call. The pat-down was crucial for the officer's own protection, as well as supported by facts giving rise to at least a reasonable suspicion that Gardner was the person who had committed the armed assault. As pointed out by Officer Polick, Cabrini Green was a dangerous, high crime neighborhood, where guns and drugs were common.

For the foregoing reasons, the Court finds that the failure to file a suppression motion did not prejudice the petitioner Derek Gardner in his trial and conviction for unlawful possession of a weapon by a convicted felon.

Dated: November 13, 2012

**SO ORDERED**  ENTER:

\----------------------------------------
**RONALD A. GUZMÁN**
**United States District Judge**